# EXHIBIT A

## Page 2

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF ARIZONA
 3
 4   CROSSFIT INC., a Delaware
     corporation,
 5
              Plaintiff,
 6
     vs.                           No. CV-14-02277-PHX-JJT
 7
     JEFF MARTIN, an individual; MIKKI
 8   LEE MARTIN, an individual, and
     BRAND X MARTIAL ARTS, a business
 9   entity of unknown origin,
10            Defendants.
                                  //
11   JEFF MARTIN, MIKKI LEE MARTIN,
     BRAND X MARTIAL ARTS, and CROSSFIT
12   BRAND X, INC.,
13            Counterclaimants,
14   vs.
15   CROSSFIT, INC., and GREG GLASSMAN,
16            Counterdefendants.
                                  //
17
18
19       CONFIDENTIAL-ATTORNEYS' EYES ONLY
20   Deposition of CARL SABA, MBA, CVA, taken on behalf
21   of Plaintiff, at 201 California Street, Suite 375, San
22   Francisco, California, commencing at 9:04 a.m., Monday,
23   April 24, 2017, before MARY J. VISCIGLIO, CSR No. 10391.
24
25
```

## Page 3

```
 1                  A P P E A R A N C E S:
 2
 3
     FOR PLAINTIFF CROSSFIT, INC., and COUNTERDEFENDANTS
 4   CROSSFIT, INC., and GREG GLASSMAN:
 5      SNELL & WILMER L.L.P.
        BY:  MATTHEW P. FISCHER, ESQUIRE
 6           TRISHA LAU, ESQUIRE
        One Arizona Center
 7      400 East Van Buren, Suite 1900
        Phoenix, Arizona  85004
 8      602-382-6000
        mfischer@swlaw.com
 9
10   FOR DEFENDANTS AND COUNTERCLAIMANTS JEFF MARTIN,
     MIKKI LEE MARTIN, BRAND X MARTIAL ARTS:
11
        EMERGENT
12      BY:  CHRISTOPHER WIMMER, ESQUIRE
        535 Mission Street, 14th Floor
13      San Francisco, California  94105
        415-894-9284
14      chris@emergent.law
15
     ALSO PRESENT:
16
        CARLYN IRWIN
17      CORNERSTONE RESEARCH
```

## Page 4

```
                          I N D E X
WITNESS:  CARL SABA, MBA, CVA
EXAMINATION                                       PAGE
   By Mr. Fischer                                   5


EXHIBITS              PLAINTIFF'S
NUMBER                DESCRIPTION                 PAGE
  1     Amended Expert Report of Carl S. Saba,
        MBA, CVA                                   33
  2     Expert Report of Carl S. Saba, MBA, CVA    44
  3     Document                                   45
  4     Fictitious Business Name Statement         64
  5     Fictitious Business Name Statement         64
  6     CrossFit Kids Transition Agreement        103
  7     CrossFit, Inc.'s Response to the Martins'
        First Set of Interrogatories              106


                      DEFENDANTS'
NUMBER                DESCRIPTION                 PAGE
                         (None)
```

## Page 5

CARL SABA, MBA, CVA
having been first duly sworn, was
examined and testified as follows:

MR. FISCHER: Mr. Wimmer, given that you have designated the entirety of Mr. Saba's report as attorneys' eyes only, do we just want to place the entire transcript under seal, and we can sort out the details of the designation later?

MR. WIMMER: I think that makes sense, Matt. Thank you.

EXAMINATION
BY MR. FISCHER:

Q. Please state your name for the record.
A. Carl Saba.

MR. FISCHER: And so the record reflects who is present at today's deposition, my name is Matt Fischer. I'm an attorney with Snell and Wilmer and counsel for the Plaintiff CrossFit, Inc., and Counterdefendant Greg Glassman. To my left, is Trisha Lau, my colleague at Snell and Wilmer; to her left, is Carlyn Irwin, with Cornerstone Research, and Mr. Wimmer is present as counsel for the Martins.

Q. Are you represented by counsel today?
A. I believe I'm represented by counsel to my right.

Page 106

1   MR. WIMMER: That is not the question you asked,
2   but you are entitled to that.
3   With that caveat.
4   THE WITNESS: I don't know if they transferred the
5   cash that they had at the time of the Transition Agreement,
6   or under the Transition Agreement.
7   BY MR. FISCHER:
8   Q.  I understand from your testimony that you relied on
9   CrossFit, Inc.'s, responses to the Martins' interrogatories
10  to determine expenses for the years 2011 to 2014; is that
11  right?
12  A.  That's correct, to determine some of the expenses
13  for those years.
14  Q.  Did those responses to those interrogatories
15  account for the Martins' salary in the provision of
16  expenses?
17  A.  It did. I assumed that their salary was included
18  in those expenses.
19          (Plaintiff's Exhibit 7 was
20          marked for identification.)
21  BY MR. FISCHER:
22  Q.  I have handed you what's been marked as Exhibit 7.
23  I see on the first page, caption, "CrossFit, Inc.'s Response
24  to the Martins' First set of Interrogatories."
25  Do you see that?

Page 107

1   A.  Yes, I do.
2   Q.  Is this the document you were just referring to?
3   A.  I believe so.
4   Q.  If you could turn to Page 14. And is this the
5   information from which you derived and determined the
6   expenses?
7   A.  Correct.
8   Q.  If I can get you to turn to Page 15, starting at
9   line 26.
10      By the way, let me ask you: Did you consider the
11  entire response to the interrogatory, or just the dollar
12  figures provided above?
13  A.  I believe I read the rest of the response to the
14  interrogatory.
15  Q.  It says: By approximately June of 2011, after the
16  Martins' salary increased to $150,000, there were no longer
17  obligations to pay commissions on the CrossFit Kids courses,
18  so CrossFit, Inc. began treating the salary and shared
19  expense allocations as indirect, as opposed to direct, costs
20  in calculating net profit. As an incorrect cost, those
21  allocations were no longer factored in -- into, calculating
22  net profit on the courses, but were instead passed on as
23  cost to the CrossFit Kids department.
24      Having read through that, do you understand that
25  the Martins' salaries were not reflected as a direct expense

Page 108

1   or integrated into the dollar figures above, as part of the
2   calculation for net profit?
3   A.  It appears to be that way.
4   Q.  How does that change your opinion?
5   A.  It would require me to treat the Martins' salary as
6   an additional expense that is not part of the expense
7   reported by CrossFit, Inc. in the responses to the
8   interrogatories.
9   Q.  You can return Exhibit 7.
10      Was it part of your understanding, or were you
11  asked to assume, that prior to the Martins becoming
12  employees of CrossFit, Inc., that the CrossFit Kids program
13  utilized centralized resources services provided by
14  CrossFit, Inc., such as information technology, legal
15  services, media, marketing, advertising, etc.?
16  A.  I was not specifically asked to assume that, no.
17  Q.  Did you assume or was it your understanding that
18  that was not the case?
19  A.  I was asked to assume that the Martins incurred
20  substantially all of the expenses that were related to the
21  CrossFit Kids business, until the end of 2010.
22  Q.  If the CrossFit Kids program utilized the
23  centralized resources, some of which I provided as examples,
24  how would that change your opinion?
25  A.  It may require me to consider an additional cost in

Page 109

1   my analysis. At the same time, it's my understanding that
2   the CrossFit Kids program generated additional seminar or
3   training business to CrossFit, Inc., as it's my
4   understanding that in order to become an affiliate, you had
5   to take both the CrossFit Kids program and the level one
6   course of CrossFit, Inc.
7       And so I would want to consider those costs, but
8   also those additional revenues. I don't know what the net
9   effect would be to my analysis.
10  Q.  Does your opinion assume that CrossFit Kids could
11  sever ties with CrossFit, Inc. and experience the same level
12  of growth that it did?
13  A.  My analysis assumes, as I stated in my report, that
14  CrossFit Kids is paying a royalty to CrossFit, Inc., for the
15  use of the CrossFit name. That doesn't imply severing
16  ties.
17  Q.  Beyond the use of the name, any other intertwined
18  services or operations that may impact the ability of
19  CrossFit Kids to function independently of CrossFit, Inc.?
20  A.  I think I just mentioned that it appears that
21  CrossFit Kids created referrals for CrossFit, Inc., and vice
22  versa.
23  Q.  Anything other than cross referrals?
24  A.  Not that I'm aware of.
25      MR. FISCHER: Let's take a break.

Page 114

1  papers again. I don't recall specifically anymore, beyond
2  what I just relayed to you, which is that we performed -- my
3  team performed several searches at my direction, and the
4  ones -- the transactions that are in my report are
5  ultimately what I thought were the best fits.
6       BY MR. FISCHER:
7  Q. If you looked at companies with the NAICS Code of
8  812990, and rejected them as not helpful for comparative
9  purpose, would that be reflected in your file or in your
10 notes somewhere?
11 A. I believe it would be included in the -- in my
12 searches, yes, and in my notes. Well, not in my notes. In
13 my list of documents considered.
14 Q. Are there typically efficiencies or economies of
15 scale associated with operating a larger organization than a
16 smaller organization?
17 A. Generally speaking, yes, but the extent of those
18 economies of scale is very highly dependent on the nature of
19 the business model.
20 Q. Did you take into account, potential economies of
21 scale in your report?
22 A. Given that my valuation of the company was based on
23 a weighting of historical results, I would say that the only
24 economies of scale that are reflected there, are the ones
25 that were realized historically. There is not an assumption

Page 115

1  of further economies of scale.
2  Q. The historical results that you utilized, included
3  a period of time in which potential economies of scale were
4  realized when the program was functioning under the
5  CrossFit, Inc. banner, correct?
6  A. That's correct.
7  Q. Now, how did you accommodate in your calculations
8  and projections, the adjustment for economies of scale?
9  A. As we discussed earlier, my estimate of future
10 results is based on a weighting of historical results.
11 Q. Was it your understanding that as employees of
12 CrossFit, Inc., the Martins had employee benefits?
13 A. My only understanding around compensation of the
14 Martins, with CrossFit, Inc, was their salary. I don't know
15 what other compensation they were receiving beyond that.
16 Q. So is it fair to say that your report does not take
17 into account or accommodate for any potential employment
18 benefits that they received?
19 A. I believe that's correct.
20 Q. Is it your understanding that certain property and
21 equipment purchased at the time the Martins were involved
22 with the CrossFit Kids program, is now being utilized in
23 conjunction with their Brand X Method Program?
24 A. I don't specifically know that, but I will take
25 your representation in that regard.

Page 116

1  Q. If equipment and property purchased for operating
2  the CrossFit Kids program was now being utilized by the
3  Brand X Method, how would that impact your calculations?
4  A. I think it's already integrated into my
5  calculations, because I'm treating the value of Brand X as a
6  mitigation or reduction to the Martins' damages.
7  Q. And how is the use of the equipment and property
8  integrated into the mitigation analysis?
9  A. Brand X could not generate economic returns without
10 the use of that property. It's an inherent assumption that
11 the property is being used to generate those returns that I
12 measured in order to define the value of Brand X, and that
13 value is then being treated as a deductor mitigation against
14 Martins' damages.
15 Q. In calculating the future loss returns scenario,
16 you utilized two methods, one of which was the H model
17 method, correct?
18 A. That's correct. It's a form of income approach.
19 Q. Are you aware of any publications or resources that
20 support the use of an H model analysis for evaluating the
21 damages associated with a tortious interference claim?
22 A. I'm not.
23 Q. The other method that you utilized was the merger
24 and acquisition method, correct?
25 A. Correct.

Page 117

1  Q. Are you aware of any resources or publications that
2  support the use of a merger and acquisition method for
3  valuing damages associated with a tortious interference
4  claim?
5  A. Not specifically.
6  Q. Isn't the H model method a dividend discount model
7  that applies to a company's dividends, rather than its free
8  cash flows?
9  A. No, it's not. It's -- it can be used for
10 dividends. It is simply a growing perpetuity formula, and
11 that growing perpetuity formula can be used in a number of
12 different context. It is an estimate of the future cash
13 flows that the business will generate.
14 Q. In conjunction with your H model analysis, you
15 assume a short term growth rate of 30 percent, a long term
16 growth rate of five percent, and a discount rate of 23
17 percent; is that correct?
18 A. That's correct.
19 Q. What are the bases for those assumptions?
20 A. The short-term growth rate of 30 percent is based
21 on the historical growth of the CrossFit Kids business
22 through early 2015. The compound three year annual growth
23 rate, through December 31st, 2014, was 46 percent. And what
24 I observed as I reviewed historical growth, is that growth
25 had been gradually slowing down percentage wise, year over

Page 118

1   year, as the business became larger, which is fairly
2   typical. And I conservatively assumed further slowdown in
3   that growth, from 46 percent to 30, in the next year, and
4   then declining from there, to a long term sustainable growth
5   rate over a five-year period of five percent.
6        The basis for the five percent is, it is similar to
7   industry growth. It is also similar to long-term GVP plus
8   inflation of the US economy. It's a rate at which the
9   business could continue to grow without continually gaining
10  market share. The basis for the discount rate of 23
11  percent, is use of an Ibbotson build up method, which is a
12  commonly applied method to derive a cost of equity for a
13  business, and it is based on a combination of published data
14  regarding historical returns for businesses of different
15  sizes and my own judgment as a valuation expert of the
16  specific attributes of CrossFit Kids' business.
17     Q. With respect to the comparisons to the industry,
18  that's the fitness and recreational sport center industry?
19     A. That's correct.
20     Q. You mentioned the GDP and inflation rate of five
21  percent. Where did you get those?
22     A. That is engrained knowledge that I have regarding
23  inflation and GDP for the US economy over very long periods
24  of timing.
25     Q. You didn't source that information?

Page 119

1    A. There is not -- I -- there used to be a time years
2   ago, where I would source that information, but I have
3   observed that information so many times now, that it's just
4   something I inherently know.
5    Q. What's the inflation rate been for the past
6   decade?
7    A. I can't answer specifically for the past decade.
8   It's been lower than longer historical periods, but longer
9   historical periods, it averages about two and a half
10  percent.
11   Q. If I said it was around 1.1 percent, would that
12  sound about right?
13   A. That would sound about right.
14   Q. Referring to the merger and acquisition method,
15  what makes a company a reasonable basis for a comparison?
16   A. A number of factors, the date of the transaction
17  and the market conditions, when the transaction occurred and
18  how similar or disparate they are relative to the valuation
19  date; the business model and description of the business;
20  the size and history of the business; the level of
21  profitability, or lack thereof, of the business; the
22  historical and projected growth of the business.
23   Q. You think that brick and mortar gyms like Gold's
24  Gym and Nutrio are reasonable comparables for CrossFit and
25  CrossFit Kids?

Page 120

1    A. I think they are imperfect comparables, as I stated
2   in my report. They are the best -- the set of comparables I
3   have come up with, are the best that are available. This is
4   often a limitation of this type of market approach, is that
5   you never find the perfect comparables. But it is still
6   beneficial to apply this approach as a secondary check on
7   value on the primary approach I applied, which was the
8   income approach.
9    Q. Include companies like Birmingham Day Spa and
10  Island Sailing Club that have no apparent relationship to
11  fitness?
12   A. I believe our search was broader. The challenge
13  with this approach is that sometimes, you have to cast a
14  wider net than you would like, in order to get enough
15  transactions to be able to support implementation of the
16  approach. If there are too few transactions, you don't have
17  a large enough sample to work with.
18   Q. I believe that based on the comparable companies,
19  you determined that the appropriate price to revenue was
20  six, right?
21   A. That's correct.
22   Q. Why?
23   A. Because for that particular metric, the
24  transactions data was for companies that had much lower
25  profitability. Just given the business model, they are not

Page 121

1   as scalable as CrossFit Kids. They don't generate the same
2   types of margins that CrossFit Kids generated.
3    Q. If your assessment of the margins that were being
4   generated was inaccurate, would the selection of the price
5   to revenue multiple of six, likewise be inaccurate?
6    A. Potentially, yes.
7    Q. Why did you determine that an appropriate market
8   value to invested capital multiple was four times?
9    A. Similar explanation. When I reviewed the profit
10  margins, for example, earnings before interest and taxes,
11  the upper core tile of the comparable group is about 21
12  percent, and the median in average are between eight and ten
13  percent of revenues. The historical margin for CrossFit
14  Kids was 71 percent, as of the valuation date, is orders of
15  magnitude higher.
16   Q. Same answer with respect to inaccuracies with
17  respect to the margins and the use of the multiple --
18   A. That's correct. If the -- if the margins were
19  substantially overstated, for example, it would influence
20  the appropriate multiple to apply.
21   Q. Did you estimate the value of the CrossFit Kids
22  basis on a controlling marketable basis, or a noncontrolling
23  nonmarketable basis?
24   A. Controlling marketable.
25   Q. Do you have Exhibit 1 handy?

Page 122

1  A. I am looking at it.
2  Q. If you can turn to paragraph 137, which can be
3  found on Page 45, mid page.
4      Do you see paragraph 137?
5  A. I do.
6  Q. You talk about the estimate of the value of CFK on
7  a noncontrolling nonmarketable basis.
8      Why are you doing that?
9  A. I believe that's an error. My intent there was for
10 that to stay controlling marketable.
11 Q. Those are typographical errors?
12 A. Correct.
13 Q. You're saying it should say "controlling marketable
14 basis"?
15 A. That's correct.
16 Q. Given your reports discussion and our discussing
17 today about the difficulty with comparables and the impact
18 on the merger and acquisition approach, why give it any
19 weight at all? Why not just utilize the H model?
20 A. Well, I believe that that method brings in some
21 market data which is helpful to confirm the approximate
22 value of the company, and that is why I have placed some
23 limited weighting on that approach.
24 Q. You also did evaluation of the Brand X Method,
25 correct?

Page 123

1  A. That's correct.
2  Q. Did you evaluate the entire business, or just the
3  teens and kids subcategory of the business?
4      MR. WIMMER: Objection. Assumes facts not in
5  evidence.
6      You can answer as you understand it.
7      THE WITNESS: I'm having difficulty answering your
8  question, because I'm not sure that I made a specific
9  assumption about that. It is -- as I understand it, it is a
10 business that the Martins established as a source of
11 replacement income, when they were no longer affiliated with
12 CrossFit or CrossFit Kids. And I made an assumption as I
13 stated in my report, that it would grow in a similar
14 trajectory to CrossFit Kids.
15     BY MR. FISCHER:
16 Q. In the assumptions that you made, did you assume
17 that the Brand X method was a program exclusively for teens
18 and kids, or did it also have an adult component to it?
19 A. I don't think I made an explicit assumption about
20 that.
21 Q. The data that you utilized to value the Brand X
22 method, was that -- did that data consist of just financial
23 information relating to a program for teens and kids, or did
24 it also include information regarding programming for
25 adults?

Page 124

1  A. My understanding is that the data that I received
2  for Brand X, historically, which was quite limited, was for
3  the entire business.
4  Q. You calculated the reasonable royalty payment for
5  use of the mark, from the Martins to CrossFit, Inc., in the
6  amount of 2.37 million dollars; is that right?
7  A. That's correct.
8  Q. Is that a one-time payment, or an annual payment?
9  A. That is based on an annual ten percent royalty of
10 revenue payment. It's a lump sum equivalent of those
11 royalties.
12 Q. When you arrived at ten percent as the royalty
13 rate, how?
14 A. Through a review of licensing data for brand assets
15 associated with fitness, through a profit split analysis,
16 essentially through an analysis of the past and future
17 anticipated margins of CrossFit Kids and through review of
18 agreements that CrossFit, Inc. had entered into, for
19 licensing of its branding assets, including the agreement
20 with Reebok.
21 Q. And you discounted the agreement with Reebok as not
22 particularly useful, because of the significant differences;
23 is that right?
24 A. Well, I believe there were different agreements or
25 different elements to the agreement with Reebok. The

Page 125

1  agreements where Reebok was paying fees back to CrossFit,
2  were not as helpful because it wasn't a clean licensing of
3  the brand, but there was an element of the agreements that
4  was for licensing of the CrossFit brand by Reebok, on sports
5  apparel that didn't contain these other -- I'll call them
6  complications to the agreement, and I felt that was the most
7  relevant.
8  Q. In looking at market or industry comparable
9  agreements, did you just look at the summary data that you
10 produced, or did you look at the agreements themselves, like
11 you did with Reebok?
12 A. I looked at the summary data and whatever
13 underlying information was available from our data source,
14 regarding the agreements.
15 Q. There is in your report, a discussion about the
16 Reebok agreement in some detail, and reasons why, based on
17 your review of the agreement, there were differences that
18 made the comparable nature of it difficult.
19     Wouldn't it likewise have been beneficial to have
20 reviewed the agreements between the comparable companies and
21 their license agreements?
22 A. Yes, but I don't believe the database that we use,
23 contain that level of detail.
24 Q. Did it contain detail regarding whether or not the
25 license was exclusive or nonexclusive?

Page 126

1   A.  I believe so, but I would actually really need to
2   go back and look at that again, to be able to answer that
3   with certainty.
4   Q.  Do you think that a royalty rate for an exclusive
5   license would be different than a royalty rate for a
6   nonexclusive license?
7   A.  I would expect it to be.
8   Q.  And if the agreements in your comparables were
9   nonexclusive, how would that impact the value of the
10  comparable information?
11  A.  I'm not sure.  I would have to review them, because
12  it's one of several inputs and factors that went into my
13  determination, the royalty rate.  It's not the only factor
14  in isolation, that determined what I thought was the
15  appropriate royalty rate.
16  Q.  In arriving at a royalty rate of ten percent, did
17  you take into account prior agreements between CrossFit,
18  Inc. and the Martins or their entities?
19  A.  Well, I have become aware since I had prepared
20  these reports, that there was a 2009 agreement between the
21  parties.  I don't believe I had that information at the time
22  that I prepared this report.
23  Q.  And what was the rate provided in the 2009 license
24  agreement?
25  A.  I believe it was 20 percent.

Page 127

1   Q.  If I told you it was 30 percent, does that ring a
2   bell?
3   A.  I don't know.  My recollection is, it was 20.
4   Q.  If the 2009 license agreement provided for 30
5   percent, do you think that would be more indicative of a
6   reasonable royalty rate for the use of the CrossFit mark,
7   than the other factors that you utilized?
8   A.  I think it would be a relevant input.  It's my
9   understanding that that rate, however, was not enforced or
10  collected from the Martins, historically.
11  Q.  Was it your understanding that the Martins would
12  receive the revenue and then pay CrossFit, Inc. its share,
13  or that CrossFit, Inc. would receive the revenue and pay the
14  Martins their share?
15  A.  For which time periods?
16  Q.  Good question.  For 2008 to 2010.
17  A.  My understanding for that period, is that CrossFit
18  was receiving the revenues and then remitting 80 percent to
19  the Martins.
20  Q.  Have you seen or considered a 2008 SME agreement
21  between CrossFit, Inc. and the Martins, or their entities?
22  A.  I have not.
23  Q.  If that agreement provided a profit split or a
24  royalty rate for the use of the mark, would that be a useful
25  data point in determining what the reasonable royalty rate

Page 128

1   might be?
2   A.  Potentially.  It would also depend, again, on
3   whether that agreement was actually enforced.  It's one
4   thing to draft an agreement between the parties, and it's
5   another whether it's actually effectuated or not.
6   Q.  And it's your understanding that prior to 2011,
7   CrossFit, Inc. did not keep the 20 percent or 30 percent of
8   the profits split per agreements between the parties?
9   A.  It's my understanding that CrossFit remitted 80
10  percent of revenues to the Martins.  As to whether the 20
11  percent that it retained, was a royalty under the agreement
12  or something else, I don't know.
13  Q.  What would the 20 percent be?
14  A.  It could be a revenue sharing agreement.  I don't
15  know what the nature of that agreement was.  I just know the
16  outcome.
17  Q.  Okay.  Well, if it was a revenue sharing
18  arrangement with an 80/20 split, is the 20 percent
19  indicative of what a reasonable royalty rate might be for
20  use of the mark?
21  A.  Potentially, yes.
22  Q.  If the reasonable royalty rate was 20 percent or 30
23  percent, as opposed to ten percent, how would that impact
24  your calculations?
25  A.  It would reduce damages to the Martins.

Page 129

1   Q.  In your Exhibit B to your amended report, do you
2   make any deductions to seminar revenues to account for a
3   split of 20 percent or 30 percent going to CrossFit, Inc.?
4   A.  I don't, but it's my understanding that those
5   deductions are already included in the numbers through 2010.
6   Q.  Included where?
7   A.  In the Martins' estimate and tax returns which form
8   the basis for the revenues through 2010.
9   Q.  In paragraph 41 of your report, which you can turn
10  to, if you like, you note that one of the key strengths of
11  the CrossFit Kids program is that it was not built on a
12  franchise model.  And yet the bulk of your comparables are
13  franchise models.
14  A.  That's correct.
15  Q.  Given your statement in paragraph 41, why did you
16  still utilize franchise model companies as comparables?
17  A.  Because they're the best comparables I could find
18  with the date that was available, and as I stated earlier,
19  my view is that there is some small value in applying that
20  approach as a confirming method.
21  Q.  Your profit split analysis drew the baseline for
22  reasonableness at between 25 and 33 percent, correct?
23  A.  Just a moment.
24  Q.  You might want to go to paragraph 156.
25  A.  The 25 and 33 percent refers to the portion of the

Page 150

1  Is the name CrossFit Kids separate from the
2  business, the definition convention that you utilized
3  throughout this report?
4  A. What I mean by the CrossFit Kids business is the
5  revenues and expenses relating to the CrossFit Kids program
6  that, as I understand it, was under the control of the
7  Martins through the end of 2010.
8  Q. The question was actually a bit more technical than
9  that, just so I understand when I'm reading your report,
10 what it is that you're talking about, when you use the
11 acronym, CFK?
12    When you say -- when you use the acronym,
13 technically initialism, CFK in the report, is that referring
14 to the name, or is that referring to the business, the
15 company, the program? What are you referring to?
16 A. It's referring to the business, to what I just
17 relayed to you, which is the revenues and expenses
18 associated with that program, which I would characterize as
19 a business.
20 Q. Just so I can understand the convention here.
21    Would it have made more sense for the definition to
22 come after the word "business," or no?
23 A. Yes, perhaps.
24 Q. Okay.
25 A. It would have been clearer if it was after the word

Page 151

1  "business."
2  Q. On paragraph eight, at the end, you say: Had they
3  not transferred control of CFK, to CFHQ, and then in the
4  next paragraph, nine, it says: Considers the equity value
5  of the CFK business, what's the difference between CFK and
6  the CFK business?
7  A. I'm using them synonymously to mean the same
8  thing.
9  Q. Is there a reason why sometimes you say "CFK" and
10 sometimes you say the "CFK business"?
11 A. Not specifically. The purpose of the definition
12 was simply to facilitate discussion in the report, so that I
13 would not have to write out CrossFit Kids business every
14 single time.
15 Q. I understand that. I just want to know when I am
16 seeing the initialism being utilized CFK, what does it mean?
17    What are you talking about?
18 A. I'm talking about the business.
19 Q. If you would go to paragraph 21. The first
20 sentence starts, "CrossFit Kids is a business."
21    Do you see that?
22 A. Yes.
23 Q. And then two sentences later, you say, "CrossFit
24 Kids is a fitness training program." Which is it?
25 A. It's a business that includes as an integral part

Page 152

1  of that business, a fitness training program.
2  Q. Turn to Page 12 and go to Paragraph 27.
3    Fourth line in, you say, "Initially, the Martins
4  were charging a $250 annual fee."
5    Do you see that?
6  A. Yes.
7  Q. Is that correct?
8  A. That's my understanding; although, we discussed
9  earlier today, that there were some affiliates which were
10 being charged a zero fee, and there were also some
11 affiliates that were being charged a $150 fee. As I
12 understand it, those were few exceptions to the rule. The
13 majority of affiliates, initially, were being charged $250
14 annual fee.
15 Q. Not $150 initially?
16 A. Well, I think it depends the time periods that
17 we're looking at.
18 Q. I'm talking about initially. Like what was the
19 first charge?
20 A. I don't know what the first charge was. I just
21 know that some affiliates were -- in the early years, were
22 charged nothing. Some were charged 150 and then some were
23 charged 250, and that was later raised to 500.
24 Q. Turn to Page 14. Paragraph 33 states there has
25 been no debt financing associated with either CrossFit Kids

Page 153

1  or Brand X Method. My question surrounds CrossFit Kids.
2    How do you know there has been no debt financing
3  associated with CrossFit Kids?
4  A. Well, I know that in regards to the Martins, I
5  think beyond perhaps the use of credit cards, there was no
6  credit facility in place or term debt in place with
7  financial institutions that I was aware of, that the Martins
8  had negotiated.
9  Q. Are you aware of any loans?
10 A. I'm not.
11 Q. If there were loans, how would that affect your
12 opinion?
13 A. It would depend on what the loan was for and
14 between which parties and on what terms.
15 Q. Turn to Page 20, referring to paragraph 48. You
16 start here, "In the valuation of the company," and I believe
17 you utilized this same nomenclature elsewhere, throughout
18 the report, when you are talking about valuing a company.
19    Did you value a company here?
20 A. I'm sorry. Which paragraph are you referring to?
21 Q. Page 20, paragraph 48.
22    MR. WIMMER: Objection. Asked and answered a
23 number of times, although not with respect to this specific
24 document. So hopefully, one answer will do it on this
25 document.

Page 162

1  licensing it for use to a third party business.
2         What are you talking about?
3         MR. WIMMER: Can I have the paragraph?
4         MR. FISCHER: Page 53, paragraph 157.
5         THE WITNESS: I don't need to refer to it. I'm
6  talking about the business operating -- operator being
7  CrossFit, Inc. and licensing it to CrossFit Kids.
8         BY MR. FISCHER:
9     Q. So no assumption as to whether or not the recipient
10 of license can then sublicense?
11    A. No.
12    Q. Have you told me all of the opinions you'll be
13 expressing at trial?
14    A. Yes. Other than any portions of my analysis that I
15 may reconsider based on today's deposition.
16    Q. Have you told me the basis for all of the opinions
17 that you have expressed in your report?
18    A. I have.
19    Q. Have you described for me all of the work that you
20 have done in the case, to date?
21    A. I have.
22    Q. No further questions at this time.
23         MR. FISCHER: Your witness.
24         MR. WIMMER: I do not have any questions.
25         MR. FISCHER: This concludes the deposition.

Page 163

1         MR. WIMMER: Read and review and sign. Electronic
2  only, and PDF is fine, please.
3         (The deposition concluded at 5:22 p.m.)
4
5
6         I have read the foregoing deposition
7  transcript and by signing hereafter, approve same.
8
9  Dated_____.
10
11
12              _____
                    (Signature of Deponent)

Page 164

1         DEPOSITION OFFICER'S CERTIFICATE
2  STATE OF CALIFORNIA    }
                          } ss.
3  COUNTY OF SAN FRANCISCO}
4
5         I, Mary J. Visciglio, hereby certify:
6         I am a duly qualified Certified Shorthand
7  Reporter in the State of California, holder of
8  Certificate Number CSR 10391 issued by the Court
9  Reporters Board of California and which is in full force
10 and effect.  (Fed. R. Civ. P. 28(a)).
11        I am authorized to administer oaths or
12 affirmations pursuant to California Code of Civil
13 Procedure, Section 2093(b) and prior to being examined,
14 the witness was first duly sworn by me.
15 (Fed. R. Civ. P. 28(a), 30(f)(1)).
16        I am not a relative or employee or attorney or
17 counsel of any of the parties, nor am I a relative or
18 employee of such attorney or counsel, nor am I
19 financially interested in this action.
20 (Fed. R. Civ. P. 28).
21        I am the deposition officer that
22 stenographically recorded the testimony in the foregoing
23 deposition and the foregoing transcript is a true record
24 of the testimony given by the witness.
25 (Fed. R. Civ. P. 30(f)(1)).

Page 165

1         Before completion of the deposition, review of
2  the transcript [XX] was [ ] was not requested.  If
3  requested, any changes made by the deponent (and provided
4  to the reporter) during the period allowed, are appended
5  hereto.  (Fed. R. Civ. P. 30(e)).
6
7  Dated: May 8, 2017
8
9
10
11
12              _____
                    Mary Visciglio, CSR 10391

```
 1                DEPOSITION OFFICER'S CERTIFICATE
 2   STATE OF CALIFORNIA    }
                            } ss.
 3   COUNTY OF SAN FRANCISCO }
 4
              I, Mary J. Visciglio, hereby certify:
 5
              I am a duly qualified Certified Shorthand
 6
     Reporter in the State of California, holder of
 7
     Certificate Number CSR 10391 issued by the Court
 8
     Reporters Board of California and which is in full force
 9
     and effect.   (Fed. R. Civ. P. 28(a)).
10
              I am authorized to administer oaths or
11
     affirmations pursuant to California Code of Civil
12
     Procedure, Section 2093(b) and prior to being examined,
13
     the witness was first duly sworn by me.
14
     (Fed. R. Civ. P. 28(a), 30(f)(1)).
15
              I am not a relative or employee or attorney or
16
     counsel of any of the parties, nor am I a relative or
17
     employee of such attorney or counsel, nor am I
18
     financially interested in this action.
19
     (Fed. R. Civ. P. 28).
20
              I am the deposition officer that
21
     stenographically recorded the testimony in the foregoing
22
     deposition and the foregoing transcript is a true record
23
     of the testimony given by the witness.
24
     (Fed. R. Civ. P. 30(f)(1)).
25
```

CARL SABA, MBA, CVA - CONF, AEO

BARKLEY
Court Reporters

```
 1         Before completion of the deposition, review of
 2   the transcript [XX] was [  ] was not requested.  If
 3   requested, any changes made by the deponent (and provided
 4   to the reporter) during the period allowed, are appended
 5   hereto.  (Fed. R. Civ. P. 30(e)).
 6
 7   Dated: May 8, 2017
 8
 9
10
11                            _____
12                               Mary Visciglio, CSR 10391
13
```

165